DECISION AND JUDGMENT ENTRY
{¶ 1} Plaintiffs-Appellants Todd and Shannon Hull, on behalf of their minor child Tristan Taylor Hull and in their individual capacities, appeal the judgment of the Scioto County Court of Common Pleas, which granted Defendant-Appellee Southern Ohio Medical Center's motion for summary judgment on appellants' negligence claim. Appellants argue that the trial court erred by granting summary judgment because genuine issues of material fact exist.
 {¶ 2} We agree with appellants and reverse the judgment of the trial court.
 I. Labor and Delivery {¶ 3} On July 8, 1996, Shannon Hull, who was pregnant and in labor at the time, was admitted to Southern Ohio Medical Center (SOMC). The progress of Shannon's labor and the fetal heart tones of her then-unborn baby were monitored throughout the evening, and Dr. Thomas Masters, a resident at SOMC, made several notations on Shannon's chart.
 {¶ 4} Apparently, one of Shannon's obstetricians, Dr. George Pettit, decided that Shannon should sleep through the night, but ordered that fetal heart tone monitoring be conducted for twenty minutes every four hours. Evidently, SOMC's nursing staff did not monitor Shannon as instructed.
 {¶ 5} The following morning, at approximately 8:20 a.m., a decrease in fetal heart tones was detected. At 8:30 a.m., the decision to proceed with a cesarean section, "as soon as possible," was made by Dr. Ronald Lopez and charted by Dr. Masters. Approximately ten to fifteen minutes later, Lora Bond, a nurse at SOMC, recognized a pattern on the fetal heart monitor tracings that correlated with possible fetal acidosis. Shannon's physicians were not informed of these changes in fetal heart tones or the possible fetal acidosis.
 {¶ 6} Shannon was then prepped for surgery and arrived in the operating room at 8:54 a.m. Spinal anesthesia was commenced at 8:56 a.m. The cesarean section was commenced at 9:25 a.m. and Tristan Taylor Hull was delivered at 9:41 a.m. with a zero Apgar score. Tristan currently suffers from cerebral palsy, chronic seizure disorders, and mental retardation.
 II. Legal Action {¶ 7} In January 1997, appellants, in both their individual capacities, and on behalf of their son Tristan, instituted a medical negligence action against: (1) Ronald Lopez, M.D.; (2) George Pettit, M.D.; (3) Thomas Masters, M.D.; (4) Carolyn Corey, M.D.; (5) Pike County Family Health Center; (6) SOMC; (7) "John Doe Physicians #1-#3"; (8) "John Doe Medical Association"; and, (9) "John Doe Hospital." All, but the "John Doe defendants", timely filed their answers to appellants' complaint.
 {¶ 8} Subsequently, appellants dismissed Dr. Corey and Pike County Family Health Center from the action. Appellants' claims against Dr. Masters were settled, and he too was dismissed from the action.
 {¶ 9} The remaining parties proceeded to conduct discovery and a plethora of depositions were taken, including depositions of Drs. Lopez and Pettit, Lora Bond, and appellants' expert witnesses, Drs. Richard L. Sweet and James Balducci.
 {¶ 10} In July 2000, SOMC filed a motion for summary judgment asserting that no genuine issue of material fact existed to be litigated and that it was entitled to judgment as a matter of law. SOMC argued that appellants could not show a prima facie case of negligence by the hospital's nursing staff because the Hulls' expert witnesses, Drs. Sweet and Balducci, testified in their depositions that at the time the decision to proceed to a cesarean section was made, Shannon's baby, Tristan, was not compromised. Thus, SOMC concluded that the testimony of appellants' own experts showed that the nurses' alleged negligence was not the proximate cause of Tristan's injuries.
 {¶ 11} In its motion and supporting memorandum, SOMC quoted extensively from the depositions of Drs. Sweet and Balducci. SOMC also attached an affidavit from Lora Bond to its motion. In her affidavit, Lora Bond asserted that on July 9, 1996, at 8:30 a.m., Drs. Lopez and Masters discussed the risks of cesarean delivery with Shannon and Todd Hull for several minutes, concluding with the Hulls' decision to proceed with the cesarean section. Nurse Bond further stated that at 8:45 a.m. she obtained Shannon's signature on the consent form and proceeded to prepare Shannon for surgery by shaving her and inserting a Foley catheter. According to Bond's affidavit, Shannon was moved to the operating room at 8:54 a.m. and anesthesia was commenced at 8:56 a.m. Finally, Nurse Bond stated that from the time Shannon was situated on the operating table, Bond "no longer had any direct patient care concerning the timing of the operation."
 {¶ 12} Subsequently, appellants filed a memorandum in opposition to appellee's motion for summary judgment arguing that genuine issues of material fact regarding proximate cause still needed to be litigated. In support of their memorandum, appellants included the affidavits of Drs. Sweet and Balducci.
 {¶ 13} In his affidavit, Dr. Sweet stated that he had reviewed all the pertinent medical records in the case. Dr. Sweet concluded that between 8:00 a.m. and 9:00 a.m., "a nurse practitioner performing with the degree of skill, care and diligence that a nurse practitioner of ordinary skill, care and diligence should employ under circumstances such as those present in this case and at that time, would have a duty to" take steps to relieve the fetal distress by intrauterine resuscitation, including giving Shannon intravenous (IV) fluids, oxygen, and changing her position. Dr. Sweet also stated that when the fetal heart monitor strip demonstrated further deterioration in Tristan's condition at approximately 8:44 a.m., the nursing staff should have recognized the need for more rapid action to deliver the child and alerted the physicians to the change in condition, urging more rapid action.
 {¶ 14} According to Dr. Sweet, the performance of SOMC's nursing staff, including Nurse Bond, fell below the acceptable standards of care, in light of the readings of the fetal heart monitoring strip, as follows: (1) the nurses did not attempt intrauterine resuscitation; (2) the nurses failed to alert the physicians of the baby's change in condition after the decision to proceed via cesarean section was made; (3) the nurses failed to impart a sense of urgency to the physicians or urge a more rapid delivery; and, (4) the nurses failed to report the baby's grave condition further up the "chain of command" when the physicians failed to act more rapidly in delivering the baby.
 {¶ 15} Dr. Sweet asserted that failure of the nurses to provide proper intrauterine resuscitation was a direct and proximate cause of Tristan's severe fetal distress and compromise. Dr. Sweet further opined that the baby's fetal distress and compromise were reversible before 9:00 a.m., and that the injuries suffered by Tristan would have been minimized had the baby been delivered in a timely manner. Unfortunately, however, the physicians also deviated from appropriate standards of care.
 {¶ 16} Finally, Dr. Sweet opined that the negligence of the nurses (i.e., failing to provide intrauterine resuscitation, alert the doctors to the baby's change of condition, and urge a more rapid delivery), combined with the negligence of the physicians (failing to deliver the baby as quickly as possible), had proximately caused the "continuation and deepening of fetal distress, and the fetal shock and lack of heartbeat and lack of perfusion, that resulted in the profound injuries and defects Tristan Hull experiences today."
 {¶ 17} In his affidavit, Dr. Balducci agrees and concurs with the facts, bases and opinions set forth in Dr. Sweet's affidavit.
 {¶ 18} SOMC filed a reply memorandum to appellants' memorandum in opposition to the motion for summary judgment. In its reply memorandum, SOMC argued, among other things, that the affidavits of Drs. Sweet and Balducci should be disregarded because they contradict their prior sworn deposition testimony.
 {¶ 19} Appellants filed a response arguing not only that the affidavits of Drs. Sweet and Balducci do not contradict their prior sworn deposition testimony, but that the legal authority cited by the hospital did not support SOMC's position that the affidavits should be disregarded.
 {¶ 20} In October 2000, the trial court granted SOMC's motion for summary judgment, resolving all appellants' claims brought against the hospital in the hospital's favor. Thereafter, appellants voluntarily dismissed their remaining claims against Drs. Pettit and Lopez, with prejudice.
 III. The Appeal {¶ 21} Appellants' timely filed an appeal with this Court and present the following assignment of error for our review:
 {¶ 22} "The trial court erred in granting appellee's motion for summary judgment[.]"
 A. Final Appealable Order {¶ 23} Initially, we must address a threshold issue of whether this Court has jurisdiction to address appellants' assignment of error on the merits. In the event that the parties involved in the appeal do not raise this jurisdictional issue, as in this case, then we must raise it sua sponte. See Whitaker-Merrell v. Geupel Co. (1972), 29 Ohio St.2d 184,186, 280 N.E.2d 922.
 {¶ 24} Appellate courts in Ohio have jurisdiction to review the final orders of lower courts in their district. See Section 3(B)(2), Article IV, Ohio Constitution; R.C. 2501.02; Prod. Credit Assn. v.Hedges (1993), 87 Ohio App.3d 207, 210, 621 N.E.2d 1360, at fn. 2; Kounsv. Pemberton (1992), 84 Ohio App.3d 499, 501, 617 N.E.2d 701. "An order of a court is a final, appealable order only if the requirements of both Civ.R. 54(B), if applicable, and R.C. 2505.02 are met." Chef ItalianoCorp. v. Kent State Univ. (1989), 44 Ohio St.3d 86, 541 N.E.2d 64, syllabus.
 1. R.C. 2505.02 {¶ 25} R.C. 2505.02 defines a final order or judgment as one which affects a substantial right and, in effect, determines the action. See R.C. 2505.02. A substantial right is a "legal right entitled to enforcement and protection by law." In re Estate of Wyckoff (1957),166 Ohio St. 354, 358, 142 N.E.2d 660. "A court order which deprives a person of a remedy which he would otherwise possess deprives that person of a substantial right." Chef Italiano Corp. v. Kent State Univ.,44 Ohio St.3d 86, 88, 541 N.E.2d 64. "To be final, an order must also determine an action and prevent a judgment." Id., citing Gen. Elec.Supply Co. v. Warden Elec., Inc. (1988), 38 Ohio St.3d 378, 528 N.E.2d 195, syllabus.
 2. Civ.R. 54(B) {¶ 26} Civ.R. 54(B) provides in pertinent part:
 {¶ 27} "When more than one claim for relief is presented in an action * * * or when multiple parties
are involved, the court may enter final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay. In the absence of such determination, any order * * * which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order * * * is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties." (Emphasis added.) Civ.R. 54(B).
 {¶ 28} "Civ.R. 54(B) applies to those situations where * * * multiple parties are involved in an action, and where the lower court has rendered a final judgment, pursuant to R.C. 2505.02, with respect to fewer than all of the parties." Chef Italiano Corp. v. Kent State Univ., 44 Ohio St.3d 86, 88, 541 N.E.2d 64.
 3. The Case Sub Judice {¶ 29} In the case sub judice, appellants filed an action against multiple parties. The judgment appealed from resolves the claims against one defendant, SOMC. Other trial court entries have dismissed and resolved the claims against a majority of the other defendants. However, not all the claims, against all the defendants, have been resolved or dismissed by the trial court. Claims against John Doe Physicians #1-#3, John Doe Medical Association, and John Doe Hospital appear to remain unresolved.
 {¶ 30} According to Civ.R. 15(D), when a plaintiff does not know the name of a defendant, he or she may designate the defendant in a pleading by any name and description. Civ.R. 15(D). The plaintiff in such a case must aver in the complaint the fact that the name of the defendant or defendants could not be discovered, and when the name of the defendant is discovered, the pleading must be amended. See id. Additionally, Civ.R. 3(A) provides that "[a] civil action is commenced by filing a complaint with the court, if service is obtained within one year from such filing * * * upon a defendant identified by a fictitious name whose name is later corrected pursuant to 15(D)." Civ.R. 3(A).
 {¶ 31} In the case sub judice, the record indicates that, although appellants named several fictional defendants in their complaint, they did not later identify these parties in an amended pleading or serve them with a summons and a copy of the complaint. Thus, since appellants did not amend the complaint pursuant to Civ.R. 15(D) and "did not serve [the fictional defendants] with a summons and a copy of the complaint within one year of the filing of the complaint, the action against them was not commenced within the meaning of Civ.R. 3(A)." Woodham v. Elyria Mem.Hosp. (July 5, 2001), Lorain App. No. 00CA7736; see, also, Lash v.Miller (1977), 50 Ohio St.2d 63, 64-65, 362 N.E.2d 642 (holding that, "Effective service of summons on the defendant is a necessary prerequisite to the commencement of a civil action.").
 {¶ 32} Therefore, the actions against the fictional defendants were never duly commenced, since service of process was never obtained pursuant to Civ.R. 3(A) and 15(C) and (D). See id.; Knott v.Bridgestone/Firestone Tire and Rubber Co. (Sept. 25, 1996), Summit App. No. 17829, fn. 2, citing Hobbs v. Lopez (1994), 96 Ohio App.3d 670, 675,645 N.E.2d 1261. Accordingly, Civ.R. 54 does not apply in the present case and the trial court's judgment is a final appealable order pursuant to R.C. 2505.02, because all claims presented before the trial court have been resolved and the order appealed determined the action. See, e.g.,Woodham and Knott, supra; Drexler v. Greater Cleveland Regional TransitAuth. (1992), 80 Ohio App.3d 367, 369, 609 N.E.2d 321; Studor v. SenecaCty. Humane Soc. (May 4, 2000), Seneca App. No. 13-99-59; Roberts v.Hagen (Feb. 9, 2000), Medina App. No. 2845-M, fn. 1; Zivich v. MentorSoccer Club (Apr. 18, 1997), Lake App. No. 95-L-184; Dillard v.Nationwide Beauty School (Dec. 11, 1990), Franklin App. No. 90AP-273.
 {¶ 33} Since we find that we have jurisdiction over appellants' appeal, we now turn to address appellants' assignment of error.
 B. Standard of Review {¶ 34} We conduct a de novo review of a trial court's decision to grant summary judgment pursuant to Civ.R. 56. Renner v. DerrinAcquisition Corp. (1996), 111 Ohio App.3d 326, 676 N.E.2d 151. The Supreme Court of Ohio has established the test to be employed when making a determination regarding a motion for summary judgment.
 {¶ 35} "Under Civ.R. 56, summary judgment is proper when `(1) no genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party.'" Welco Industries, Inc. v. Applied Cos.,67 Ohio St.3d 344, 346, 1993-Ohio-191, 617 N.E.2d 1129 (citations omitted).
 {¶ 36} Therefore, upon review, we give no deference to the judgment of the trial court. See Renner, supra.
 {¶ 37} Additionally, when a party to an action moves for summary judgment, the movant has the burden of showing that no genuine issue of material fact exists as to all essential elements of a claim, even those issues the opposing party would bear the burden of proving at trial. SeeVahila v. Hall, 77 Ohio St.3d 421, 1997-Ohio-259, 674 N.E.2d 1164. However, a nonmoving party may not rest upon the allegations set forth in its pleadings in response to a properly supported summary judgment motion. See State ex rel. Mayes v. Holman, 76 Ohio St.3d 147,1996-Ohio-420, 666 N.E.2d 1132. The nonmoving party must show that a genuine issue of material fact remains to be tried, by pointing to specific facts in the record, either through affidavits or by other proper means. See id.
 C. The Affidavits of Drs. Sweet and Balducci {¶ 38} In the case sub judice, SOMC made a properly supported motion for summary judgment. Appellants responded with their own arguments and presented the affidavits of Drs. Sweet and Balducci to support those arguments. However, appellee argues that we should disregard the affidavits of Drs. Sweet and Balducci because they contradict their prior sworn deposition testimony. SOMC states that "a non-moving party may not defeat a motion for summary judgment by filing an affidavit, which conflicts with or modifies prior deposition testimony" and relies on the case of Steiner v. Steiner (July 12, 1995), Scioto App. No. 93CA2191, to support this proposition.
 {¶ 39} Even if we were to accept SOMC's contention that the affidavits of Drs. Sweet and Balducci did contradict their prior sworn deposition testimony, we would nonetheless disagree with SOMC's conclusion, because SOMC fails to correctly state the law on this issue. As we have stated in a number of prior cases:
 {¶ 40} "The limitation on affidavits that conflict with prior depositions applies only when: (1) the affiant is a party to the litigation, (2) her affidavit is inconsistent with her own prior deposition, and (3) the affidavit neither suggests that the affiant was confused at the deposition nor offers a reason for the contradiction in her prior testimony." Vanderpool v. Southern Ohio Medical Center, Scioto App. No. 01CA2777, 2001-Ohio-2434, citing Push v. A-Best Prods. Co. (Apr. 18, 1996) Scioto App. No. 94CA2306; see, also, Clemmons v. Yaezell (Dec. 29, 1988), Montgomery App. No. 11132.
 {¶ 41} The affidavits challenged by appellee in the case sub judice are not those of a party witness, but those of expert witnesses,not parties to the action. Thus, the limitation sought by SOMC is not applicable to the facts presently before us, and the affidavits should be considered in our determination of whether summary judgment was proper. See Clemmons, supra.
 D. SOMC's Potential Liability {¶ 42} The Supreme Court of Ohio has held that, "In a negligence action involving the professional skill and judgment of a nurse, expert testimony must be presented to establish the prevailing standard of care, a breach of that standard, and that the nurse's negligence, if any, was the proximate cause of the patient's injury." Ramage v. CentralOhio Emergency Srvcs., 64 Ohio St.3d 97, 1992-Ohio-109, 592 N.E.2d 828, paragraph one of the syllabus; see, also, Berdyck v. Shinde,66 Ohio St.3d 573, 1993-Ohio-183, 613 N.E.2d 1014. Further, under the doctrine of respondeat superior, a hospital is liable for the negligent acts of the nurses in its employ. See Berdyck, supra, citing Klema v.St. Elizabeth's Hosp. of Youngstown (1960), 170 Ohio St. 519,166 N.E.2d 765.
 1. Prevailing Standard of Care and Breach of the Standard {¶ 43} SOMC does not contend that appellants failed to put forth evidence that, if believed, would establish the nurses' prevailing standard of care and a breach of that standard.
 {¶ 44} Appellants' experts stated in their affidavits that they were aware of, and knowledgeable regarding, the prevailing standard of care that should be exercised by nurse practitioners. Dr. Sweet stated in his affidavit that, under the circumstances presented to SOMC's nursing staff, the prevailing standard of care would impose a duty upon a nurse practitioner to do the following: 1) provide intrauterine resuscitation, including changing Shannon Hull's position, giving her oxygen and IV fluids, in order to relieve the fetal distress; 2) conduct careful monitoring of uterine contractions; 3) inform the doctors of the change in condition demonstrated on the fetal heart monitor strip after the decision to proceed via cesarean section was made; and, 4) urge the doctors to proceed more rapidly with the delivery in light of the change in the baby's condition and report up the "chain of command" if the doctors failed to do so.
 {¶ 45} Dr. Sweet then stated that the performance of SOMC's nursing staff fell below the prevailing standard of care in that they took none of the indicated actions.
 2. Proximate Cause of the Injury {¶ 46} The hospital does, however, strenuously contest the existence of evidence going toward the issue of proximate cause. Dr. Sweet concluded in his affidavit that the nursing staff's negligence combined, and co-operated with, the negligence of the doctors, thereby causing the catastrophic injuries to Tristan Hull's brain. Thus, the issue presented in the motion for summary judgment that we must resolve is whether appellants put forth evidence that would create an issue of material fact concerning proximate cause.
 {¶ 47} The Supreme Court of Ohio has explained causation as follows:
 {¶ 48} "Where a breach of duty has occurred, liability will not attach unless there is a causal connection between the conduct * * * and the loss suffered * * *.
 {¶ 49} "The standard test for establishing causation is the sine qua non or `but for' test. Thus, a defendant's conduct is a cause of the event (or harm) if the event (or harm) would not have occurred but for that conduct; conversely, the defendant's conduct is not the cause of the event (or harm) if the event (or harm) would have occurred regardless of the conduct." Anderson v. St. Francis-St. George Hospital (1996) 77 Ohio St.3d 82, 84-85, 671 N.E.2d 225.
 {¶ 50} The court further stated:
 {¶ 51} "the standard test for establishing causation is the `but for' test. `As a rule regarding legal responsibility, at most this must be a rule of exclusion: if the event would not have occurred `but for' the defendant's negligence, it still does not follow that there is liability, since other considerations remain to be discussed and may prevent liability. It should be quite obvious that, once events are set in motion, there is, in terms of causation alone, no place to stop.' Accordingly, an act is not regarded as a cause of an event if the particular event would have occurred without the doing of the act." Id. at 86, quoting Prosser Keeton, Law of Torts (5th Ed. 1984), 265 (citations omitted).
 {¶ 52} Furthermore, this Court has previously noted that, since determinations of proximate cause almost always present questions of fact, summary judgment on the issue of proximate cause ordinarily is inappropriate. See Stibley v. Zimmerman (Aug. 26, 1998), Athens App. No. 97CA51; see, also, Keister v. Park Centre Lanes (1981), 3 Ohio App.3d 19,443 N.E.2d 532; Whiteleather v. Yosowitz (1983), 10 Ohio App.3d 272,274, 461 N.E.2d 1331; Strother v. Hutchinson (1981), 67 Ohio St.2d 282,288, 423 N.E.2d 467.
 {¶ 53} Within this legal framework, we will consider SOMC's arguments in turn.
 a. Intrauterine Resuscitation {¶ 54} First, SOMC argues that the testimony and affidavits of Drs. Sweet and Balducci fail to establish that the nurses' failure to provide intrauterine resuscitation had any causative effect regarding Tristan's injuries. SOMC's conclusion is that the doctors' delay in performing the cesarean section was the cause of Tristan's injuries and thus, was an intervening, superseding cause of Tristan's injuries, thereby absolving the hospital of liability.
 {¶ 55} In Berdyck v. Shinde, 66 Ohio St.3d 573, 1993-Ohio-183,613 N.E.2d 1014, a case analogous to the one currently before this Court, the Supreme Court of Ohio held:
 {¶ 56} "The intervening negligence of an attending physician does not absolve a hospital of its prior negligence if both co-operated in proximately causing an injury to the patient and no break occurred in the chain of causation between the hospital's negligence and the resulting injury. In order to break the chain, the intervening negligence of the physician must be disconnected from the negligence of the hospital and must be of itself an efficient, independent, and self-producing cause of the patient's injury." Id. at paragraph six of the syllabus.
 {¶ 57} Furthermore, in a case quoted by the Berdyck court, the Supreme Court of Ohio held that, "Concurrent negligence consists of the negligence of two or more persons concurring, not necessarily in point of time, but in point of consequence, in producing a single indivisible injury." Garbe v. Halloran (1948), 150 Ohio St. 476, 83 N.E.2d 217, paragraph one of the syllabus.
 {¶ 58} In Berdyck, the court held that a jury could find, based on the evidence in that case, that a nurse's negligence (i.e., failure to properly inform the treating physician of the patient's condition and monitor the patient as instructed by the physician) and the physician's own negligence were concurring proximate causes of the patient's injuries. See Berdyck, supra.
 {¶ 59} SOMC is correct in stating that Drs. Sweet and Balducci testified and affirmed that, had the child been delivered by 9:00 a.m. or even 9:15 a.m., it is more probable that Tristan would not have suffered such severe injuries. But, that is not where the experts' opinions ended. Dr. Sweet further opined that had SOMC's nursing staff provided intrauterine resuscitation, the progression of fetal distress towards fetal shock and lack of perfusion would have been delayed or interrupted. The nurses' failure to provide intrauterine resuscitation continued up to the beginning of Shannon's surgery and providing intrauterine resuscitation may well have provided more time within which to perform the cesarean section. Thus, reducing fetal stress and thereby delaying the onset of fetal shock, through the use of intrauterine resuscitation, may have averted or minimized Tristan's injuries.
 {¶ 60} Accordingly, we cannot say, as a matter of law, that the doctors' negligence was disconnected from the alleged negligence of SOMC's nursing staff. Under the current set of facts, it would appear that the doctors' negligence and the nurses' alleged negligence may have concurred in causing Tristan's injuries, creating a question of fact better answered by a jury.
 {¶ 61} Also, according to SOMC, Drs. Sweet and Balducci both testified that as of 8:30 a.m. on July 9, 1996, Tristan was not yet compromised and the decision by Drs. Lopez and Masters to proceed to a cesarean section was appropriate. Thus, SOMC concludes that the failure to provide intrauterine resuscitation and to closely monitor Shannon's contractions were not the proximate cause of Tristan's injuries, because, at the time the decision to deliver Tristan by cesarean section was made, no permanent injury had been sustained by the baby.
 {¶ 62} However, even after 8:30 a.m., SOMC's nursing staff still did not provide appropriate intrauterine resuscitation. Thus, in this case, this too illustrates the factual nature of the issue of proximate cause.
 b. Notification of Patient's Deterioration in Condition {¶ 63} SOMC's second argument is that Lora Bond's failure to notify the doctors about Tristan's change in condition at approximately 8:44 a.m. and urge a faster delivery was also not the proximate cause of the baby's injuries.
 {¶ 64} SOMC's argument hinges on an earlier decision of this Court — Dillon v. Med. Ctr. Hosp. (1993), 98 Ohio App.3d 510,648 N.E.2d 1375. In Dillon, we succinctly laid out the facts as follows:
 {¶ 65} "On January 22, 1988, appellant Ova L. Dillon, Jr. suffered injuries to his left leg when he fell from the back of a truck. Appellant went to the hospital's emergency room for treatment. Doctors placed a cast on his leg and admitted him to the hospital.
 {¶ 66} "On January 23, 1988, appellant developed circulation problems in his left foot. The circulation improved after Dr. Max Hickman ordered the cast pressure reduced. During the next two days, appellant experienced more circulation problems. On January 24, 1988 at 3:50 p.m., nurses notified Dr. George Boll that appellant's circulation problems had worsened. Dr. Boll ordered the nurses to raise appellant's leg four inches. The nurses complied, and appellant's circulation improved.
 {¶ 67} "On January 25, 1988 at 8:25 a.m., Dr. Boll examined appellant and wrote "toes are cool and getting number" on his progress notes. Twelve hours later, Dr. Boll removed the top of appellant's cast. Although circulation initially appeared to be returning to appellant's left foot, three hours later additional circulatory problems developed. Nurses contacted Dr. Hickman on January 26, 1988, at 2:00 a.m. about the problems. Dr. Hickman arrived at the hospital at 5:00 a.m. and determined that appellant suffered from compartment syndrome. At 5:30 a.m. Dr. Hickman performed a fasciotomy. Despite that surgery and more surgery performed a week later, compartment syndrome complications continued until other doctors amputated appellant's leg on October 13, 1988." Id. at 511-512.
 {¶ 68} In his action against the hospital, Dillon alleged that the nurses were negligent in his treatment because they failed to chart hourly circulation reports before 3:50 p.m. on January 24, 1998. For an eight-hour period prior to 3:50 p.m. on January 24, 1998, the nurses only performed three circulation checks instead of eight. However, Dillon's treating physician acknowledged that he was negligent in Dillon's treatment in that he should have diagnosed compartment syndrome at 3:50 p.m. on January 24, 1988, and performed the fasciotomy in lieu of merely ordering that Dillon's leg be elevated. Instead the fasciotomy was not performed until two days later. See id.
 {¶ 69} Faced with that set of facts and citing the Supreme Court of Ohio's decisions in Berdyck and Albain v. Flower Hospital, (1990),50 Ohio St.3d 251, 553 N.E.2d 1038, overruled on other grounds, Clark v.Southview Hosp. Family Ctr., 68 Ohio St.3d 435, 1994-Ohio-519,628 N.E.2d 46, we held as follows:
 {¶ 70} "[W]e find that as a matter of law the nurses' alleged negligence did not co-operate with the physicians' negligence to proximately cause appellant's injuries. The nurses' alleged negligent acts all occurred before 3:50 p.m. on January 24, 1988. Dr. Boll and Dr. Hickman committed negligent acts not only on that day, but also during the next two days when, despite the absence of negligence by others, they failed to properly diagnose and timely treat appellant's further developing compartment syndrome. The physicians' continued acts of negligence operated to break the chain of causation between the nurses' acts and appellant's injuries. After 3:50 p.m., the nurses committed no negligent acts co-operating with the physicians' negligent acts." SeeDillon v. Med. Ctr. Hosp., 98 Ohio App.3d 510, 516, 648 N.E.2d 1375.
 {¶ 71} It is apparent from our holding in Dillon that we relied heavily on the fact, present in that case, that the nurses' negligence ended nearly two days before the culmination of the physician's negligence. Apparently, the circulation checks were properly done after 3:50 p.m. on January 24, 1988, enabling a reasonable surgeon to diagnose compartment syndrome and to prevent Dillon's ultimate injury.
 {¶ 72} The facts of Dillon are very distinguishable from those presently before us. According to the evidence present in the case sub judice, the nurses failed to alert the doctors to Tristan's worsening condition minutes before surgery. Also, in Dillon, there was no evidence tending to show that the nurses should have recognized the need for faster action or different treatment. Here, we have testimony and affidavits indicating that the nurses did recognize, or should have recognized, the deepening fetal distress and the resulting need to rapidly deliver the baby.
 {¶ 73} Finally, SOMC contends that the doctors had monitor strips available to them for their review, and that alerting them to the change in Tristan's condition and urging a faster delivery would not have changed the doctors' response. Similarly, they contend that reporting "up the chain of command" would also have had no effect. Once again, these arguments present factual questions far better resolved by a jury than by summary judgment.
 {¶ 74} Thus, appellants have presented evidence, which when construed in their favor, could lead reasonable minds to conclude that the care provided by SOMC's nursing staff to Shannon and Tristan Hull breached the prevailing standards of care and that this breach was a proximate cause of Tristan's injuries.
 {¶ 75} Accordingly, the judgment of the trial court is REVERSED and this cause is remanded for further proceedings not inconsistent with this opinion.
Judgment reversed and remanded.
Kline, J.: Concurs in Judgment Only.
Abele, P.J.: Dissents.