DECISION AND JUDGMENT
{¶ 1} This is an appeal from a Scioto County Common Pleas Court summary judgment in favor of Betty D. Montgomery, Auditor of State (Auditor), and the Alcohol, Drug Addiction and Mental Health Services Board of Adams, Lawrence and Scioto Counties (ADAMH), defendants below and appellants herein, on claims brought against them by Brenda Covert, plaintiff below and appellant herein.
 {¶ 2} Appellant assigns the following errors for review and determination:
FIRST ASSIGNMENT OF ERROR:
"BECAUSE BRENDA COVERT AS A MATTER OF LAW DID NOT CAUSE ANY ILLEGAL EXPENDITURE OF PUBLIC MONEY, THE TRIAL COURT ERRED WHEN IT DECLINED TO ISSUE SUMMARY JUDGMENT DECLARING THE FINDING FOR RECOVERY AGAINST MS. COVERT TO BE INVALID, AND INSTEAD ISSUING SUMMARY JUDGMENT IN FAVOR OF THE AUDITOR OF STATE."
SECOND ASSIGNMENT OF ERROR:
"BECAUSE IT MISINTERPRETED THE APPLICATION OF R.C. 340.04(E), THE TRIAL COURT ERRED WHEN IT DECLINED TO ISSUE SUMMARY JUDGMENT IN FAVOR OF BRENDA COVERT FOR HER UNPAID COMPENSATION TO MAY 20, 2003, AND INSTEAD ISSUED SUMMARY JUDGMENT IN FAVOR OF THE ADAMH BOARD."
 {¶ 3} In 1995, appellant was hired as the ADAMH finance director. Three years later, she became the chief financial officer.[1] During her tenure at the agency, appellant routinely completed time sheets that reflected forty hours worked per week. At the same time, however, she recorded her actual weekly work hours using a "flex" system. Under her view of how the system operated, if appellant worked more than eight hours in one day, she used that overage to take time off on other days, even though her official time sheets reflected eight hours worked for both days.
 {¶ 4} In October 2002, ADAMH Chief Executive Officer John Hogan terminated appellant's employment. At that time, appellant received $13,415.53 for 358.8 for unused vacation hours. During a 2003 agency audit, Tony Pollard, the agency's new executive director, alerted the Auditor of possible fraud issues concerning appellant's flextime. A subsequent time sheet audit concluded that appellant did not list all the time that she was away from the office as vacation time, and that she claimed more hours than she was entitled to claim. The Auditor concluded that appellant owed ADAMH $13,460.40. Appellant complied with the Auditor's finding and reimbursed ADAMH "under protest."
 {¶ 5} Appellant filed the instant action on June 3, 2004 and alleged that the Auditor failed to credit her for the hours she worked, either away from the office or other than the regular work day. She further averred that the Auditor "falsely accused" her of wrongdoing in handling her vacation pay. Appellant requested a declaratory judgment that the Auditor's findings are "unlawful and invalid."[2]
 {¶ 6} Appellant's March 4, 2005 amended complaint asserts the same claim against the Auditor and a new claim against ADAMH. Appellant alleged that although the agency's executive director ostensibly terminated her employment in October 2002, her termination was not effective until the May 2003 executive board approval. Appellant claimed that she is owed compensation for that period and demanded compensatory damages against ADAMH.[3] The Auditor and ADAMH both denied liability and asserted numerous affirmative defenses.
 {¶ 7} On September 30, 2005, ADAMH requested summary judgment. The agency conceded that R.C. 340.04 requires executive board approval for non-classified employee terminations, but claimed that nothing in the statute requires board approval prior to the termination. Thus, ADAMH asserted that (1) appellant's termination was complete in October 2002, even though the board did not formally ratify the action for nearly seven months; and (2) appellant is not entitled to compensation for the period between her termination and the board's subsequent ratification.
 {¶ 8} The Auditor's summary judgment request,[4] citing the ADAMH "Employee Handbook," asserted that (1) "flextime" existed primarily for child care purposes and did not apply to appellant; and (2) "comp time" is not permitted for ADAMH employees.[5] In support of its motion the Auditor attached an affidavit from Heather Kammer, the "assistant auditor" who reviewed the retrieved data base calendars. Kammer stated that based upon her review, appellant used between "360 hours" and "608 hours" of "comp time" (instead of vacation time) when taking "leave," thus resulting in the "vastly overstated" vacation severance compensation. Kammer further asserted that appellant received $13,460.40 for payment of vacation time to which she was not entitled.
 {¶ 9} Appellant's summary judgment request asserted that[6] with respect to her claim against ADAMH, Ohio law allows termination only with prior executive board approval. Thus, appellant reasoned, her termination could not take effect until May 2003, and that she is entitled to compensation until that time. Also, appellant argued that the employee handbook allowed "flextime" to be used in cases other than child care purposes within "established limits." Further, she cited John Hogan's deposition testimony that ADAMH employees were granted considerable flexibility to set their schedules and to complete their time sheets.
 {¶ 10} With respect to R.C. 340.04, the trial court determined that the statute does not require executive board advance approval before appellant's termination. Characterizing board approval as a condition subsequent rather than a condition precedent, the court concluded that appellant was properly terminated under Ohio law in October 2002. Thus, she is not entitled to compensation for the period after October 2002.
 {¶ 11} Regarding appellant's claim against the Auditor, the trial court concluded that neither Ohio law nor the employee handbook allowed her to reduce the number of hours she worked in one week by the amount of hours she worked over forty hours in a previous week. The court noted flextime typically allows people to "adjust" work hours "during a day or week," but "not to change the total number of work hours" in a week. Insofar as her contention that her supervisor John Hogan approved her use of flextime, the court found that Hogan "expressly denie[d]" having approved the practice and, even if he had not, the court opined that "[s]he could not reasonably rely on any assurance . . . that she could take time off to compensate her for working overtime."
 {¶ 12} Consequently, the trial court awarded ADAMH and the Auditor summary judgment and ordered the complaint dismissed with prejudice. This appeal followed.
 I {¶ 13} Appellate courts review summary judgments de novo.Broadnax v. Greene Credit Service (1997), 118 Ohio App.3d 881,887, 694 N.E.2d 167; Coventry Twp. v. Ecker (1995),101 Ohio App.3d 38, 41, 654 N.E.2d 1327. In other words, appellate courts afford no deference to trial court decisions, Hicks v. Leffler
(1997), 119 Ohio App.3d 424, 427, 695 N.E.2d 777; Dillon v. Med.Ctr. Hosp. (1993), 98 Ohio App.3d 510, 514-515, 648 N.E.2d 1375. Rather, appellate courts conduct an independent review to determine if summary judgment was appropriate. Woods v. Dutta
(1997), 119 Ohio App.3d 228, 233-234, 695 N.E.2d 18; Phillips v.Rayburn (1996), 113 Ohio App.3d 374, 377, 680 N.E.2d 1279.
 {¶ 14} Under Civ.R. 56(C), summary judgment is appropriate when the movant can show that (1) no genuine issues of material fact exist, (2) she is entitled to judgment in her favor as a matter of law and (3) after the evidence is construed most strongly in favor of the non-movant, reasonable minds can come to but one conclusion. Zivich v. Mentor Soccer Club, Inc. (1998),82 Ohio St.3d 367, 369-370, 696 N.E.2d 201; Mootispaw v.Eckstein (1996), 76 Ohio St.3d 383, 385, 667 N.E.2d 1197. Parties requesting summary judgment bear the initial burden to show that no genuine issues of material fact exist and that they are entitled to judgment in their favor as a matter of law.Vahila v. Hall (1997), 77 Ohio St.3d 421, 429, 674 N.E.2d 1164;Dresher v. Burt (1996), 75 Ohio St.3d 280, 293, 662 N.E.2d 264. Once that burden is satisfied, the onus shifts to the non-moving parties to provide rebuttal evidentiary materials. See Trout v.Parker (1991), 72 Ohio App.3d 720, 723, 595 N.E.2d 1015; CampcoDistributors, Inc. v. Fries (1987), 42 Ohio App.3d 200, 201,537 N.E.2d 661. With these principles in mind, we turn our attention to the case at bar.
 II {¶ 15} We first consider, out of order, appellant's second assignment of error. Appellant argues that the trial court erred both in awarding ADAMH summary judgment and in overruling her summary judgment request. In particular, appellant contends that the trial court misinterpreted R.C. 340.04 by determining that executive board prior approval or ratification of the supervisor's termination decision was not necessary before appellant's termination became effective. We disagree with appellant.
 {¶ 16} R.C. 340.04 states in pertinent part:
"In addition to such other duties as may be lawfully imposed, the executive director of a board of alcohol, drug addiction, and mental health services shall:
"(A) Serve as executive officer of the board and subject to theprior approval of the board for each contract, execute contracts on its behalf;
"* * *
"(E) Employ and remove from office such employees and consultants in the classified civil service and, subject to the approval of the board, employ and remove from office such other employees and consultants as may be necessary for the work of the board, and fix their compensation and reimbursement within the limits set by the salary schedule and the budget approved by the board;" (Emphasis added.)
There is no dispute that appellant was not a classified civil service member.[7] Rather, the dispute involves the statute's interpretation regarding board approval. Appellant argues that because executive board approval is required under subsection (E), her termination was not effective until the board's approval occurred approximately seven months after her separation. Appellant notes that subsection (A) explicitly requires "prior approval."
 {¶ 17} ADAMH argues, and the trial court found, that the statute does not require prior approval for termination, as it does for other actions (such as executing contracts under subsection (A) of the statute). ADAMH further contends that had the Ohio General Assembly intended to require prior approval for employee termination, those words would have been used in subsection (E) as they are used in subsection (A).
 {¶ 18} This matter appears to be a case of first impression. The parties do not cite any authority that construes the statute on this point and we have found none in our own research. Generally, statutory construction is a legal issue that appellate courts review de novo. State v. Lawless (Oct. 14, 1998), Washington App. No. 97CA823. A statute that is unambiguous and definite on its face must be applied as written. State ex rel.Herman v. Klopfleisch (1995), 72 Ohio St.3d 581, 584,651 N.E.2d 995; Vought Industries, Inc. v. Tracy (1995),72 Ohio St.3d 261, 265-266, 648 N.E.2d 1364. To interpret a statute, courts must give effect to the words explicitly used in a statute, rather than deleting words or inserting words not used. SeeState v. Taniguchi (1995), 74 Ohio St.3d 154, 156,656 N.E.2d 1286; State v. Waddell (1995), 71 Ohio St.3d 630, 631,646 N.E.2d 821.
 {¶ 19} The Ohio General Assembly explicitly stated in R.C.340.04(A) that an executive director cannot execute contracts without the executive board's prior approval. The legislature did not, however, insert that same word (prior) into subsection (E) of the same provision. We agree with the trial court and appellee that if the legislature had intended to require prior approval before an executive director may terminate a non-classified employee's employment, it would have included that requirement in the statute. It did not. Consequently, we will not read such a requirement into the statute.
 {¶ 20} Appellant further contends that her termination was not actually "effective" until board approval. We disagree with appellant. Here, appellant adds the word "effective" to the statute. However, R.C. 340.04 does not explicitly state that employment or removal from office is ineffective until board approval, and we see no reason to insert that language into the statute. To the contrary, this interpretation could potentially lead to absurd results. For example, if an employee is hired and begins work in January, but the board did not meet and approve that hire until the following month, is employment not effective until board approval (and the employee not entitled to wages for time worked during the interim)? If an employee is terminated for criminal misconduct, but the board does not meet and ratify the decision until the following month, is that employee entitled to continue to collect wages? We believe that statutes should not be construed to permit absurd results and this could conceivably occur under this interpretation. See Kern v. Chillicothe (Sep. 5, 1997), Ross App. No. 96CA2225; Dingess v. Hull (Jun. 2, 1989), Scioto App. Nos. 1734 1735; Hayburn v. Jayjohn (Nov. 24, 1987), Jackson App. No. 544. We believe that statute provides for executive board oversight of the executive director's activities. The statute recognizes that a director must control an agency's day-to-day activities and, thus, possess the authority to hire and fire employees as the need arises. A board may not always be able to immediately meet and approve, or disapprove, of a director's decisions.
 {¶ 21} For these reasons, we agree with the trial court's conclusion that (1) R.C. 340.04 does not require the executive board to give prior approval for appellant's termination; and (2) the effective date of appellant's termination was not postponed until subsequent board approval. Thus, we agree that appellant is not entitled to a salary during the interim period and the trial court correctly awarded summary judgment to ADAMH on this issue.
 {¶ 22} Accordingly, we hereby overrule appellant's second assignment of error.
 III {¶ 23} In her first assignment of error, appellant asserts that with respect to the vacation time issue the trial court erred both in awarding the Auditor summary judgment request and in overruling appellant's request for summary judgment.[8]
 {¶ 24} This assignment of error appears to turn on two issues: (1) whether appellant could permissibly accrue flextime (or comptime);[9] and, (2) if she could, whether the Auditor correctly accounted for that time. After our review of the evidentiary materials in the case sub judice, we believe that at this juncture the facts are too inconclusive on either issue for summary judgment to have been granted.
 {¶ 25} John Hogan testified in his deposition that "comp" time was not permitted at ADAMH after 1985. The ADAMH employee handbook allowed for flextime, but apparently as part of the agency's "child care assistance." Appellant admitted during her deposition that she did not qualify for child care benefits. We note, however, that the employee handbook refers to the existence of other timekeeping policies:
 {¶ 26} "602 WORK SCHEDULES
The normal work schedule for all employees is eight hours a day, five days a week. Supervisors will advise all employees of the times their schedules will normally begin and end.
Staffing needs, operational demands and exceptional circumstances, may necessitate variations in starting and endingtimes, as well as variations in the total hours that may bescheduled each day and week.
 {¶ 27} Flextime scheduling is available in some cases toallow employees to vary their starting and ending times each daywithin established limits. Employees should consult theirsupervisor for the details of this program." (Emphasis added.)
 {¶ 28} In other words, Section 602 allows, with a supervisor's permission, flexible scheduling in instances beyond that specified in other handbook provisions. Appellant attested in her affidavit that Hogan approved her accruing "flex or compensatory time" for work performed "outside the normal forty-hour workweek." This is sufficient to carry her initial summary judgment burden to establish that her supervisor permitted some degree of flexible scheduling.
 {¶ 29} Appellant's affidavit is lacking, however, in explaining how that time was used. She asserts that "flextime" accrued for working more than a normal forty-hour work week was used at other times when she would be "away from the office during the normal workweek." Appellant does not, however, specify whether this occurred in instances when she would simply work less hours in one day, or when she would be absent from the office for the entire day or several days.[10]
 {¶ 30} In attempting to rebut appellant's claim that her supervisor permitted "flextime," the Auditor relies on John Hogan's deposition. The trial court also cited Hogan's testimony and noted that "[h]e expressly denie[d] that he ever approved that practice." We, however, are not necessarily convinced about this point. Indeed, at this stage of the proceedings we tend to agree with appellant's counsel's observation that this issue is quite possibly "hopelessly confused."[11] We believe that Hogan's Testimony actually lends support to each side's summary judgment request. On the one hand, he afforded his employees latitude to work whatever hours they wanted so long as they satisfied their job requirements. This supports appellant's claim that she could accrue flextime for hours worked over a forty hour work week. On the other hand, Hogan testified he did not "expect" his employees to either keep an hour-for-hour exchange of time or build up a huge reserve of flextime.[12] Further, Hogan indicated it was not his policy to allow flextime to be taken in lieu of vacation time if an employee was on actual vacation.[13]
 {¶ 31} ADAMH also asserts that the second paragraph in Section 602 permits only upward (in excess of the minimum forty hour work week) variations, and not downward variations or carryover hours, from day-to-day or week-to-week. We disagree with their interpretation of the handbook language. The word "variant" is defined in The American Heritage Dictionary, New College Edition, as "deviating from a standard; exhibiting slight difference." We note that the definition does not appear to embrace the view that the "slight difference" or "deviation" must only be a greater deviation and not a lesser deviation. In other words, the use of the word "variations" in Section 602 appears to allow for either more hours or less hours scheduled for a work day, not only more hours as the agency suggests.
 {¶ 32} The second issue is to determine exactly how the Auditor accounted for the flextime hours. Appellant suggests in her deposition and affidavit that she used flextime to work fewer hours one day after working in excess of eight hours on a previous day. Hogan's deposition testimony supports this use of flextime and we see nothing in the employee handbook to explicitly prohibit it. By the same token, nothing in appellant's deposition or affidavit supports using such time while on vacation. Hogan's deposition testimony also supports the position that this is an improper use of such time. No clear indication exists in the record that appellant used flextime while on vacation, but references do exist concerning several vacation trips during her ADAMH employment. Auditor Heather Kammer's deposition testimony is also somewhat unclear. In conducting her audit, Kammer testified that she looked for hours spent "away from the office." She did not, however, clarify whether those hours involved shortened workdays (leave early), or whether they involved hours that should have been charged as vacation time.
 {¶ 33} To summarize, we believe that at this juncture, the deposition and affidavits do not permit summary judgment for either side. Although the evidentiary materials suggest that ADAMH office policy was flexible and allowed some degree of "flextime" or "comp time," the extent of that policy is not clear. It is also not clear whether "flex" or "comp" time could be used for vacation. Finally, we do not know whether the hours the Auditor charged against appellant are for flextime used when leaving work early, or used while on vacation.[14]
 {¶ 34} Having sustained appellant's first assignment of error to the extent discussed above, we hereby affirm in part and reverse in part the trial court's judgment and hereby remand the matter for further proceedings. The parties are encouraged to clarify (1) the extent to which appellant could accrue "flextime," (2) the extent to which appellant could use "flextime" (i.e. could she use it only to work less hours on a subsequent work day or could she also use it lieu of vacation time while on a trip) and (3) whether the hours "out of the office" charged against appellant during the Kammer audit are for time spent away from the office during a short work day or are they vacation time that should have been charged to vacation rather than "flextime."
JUDGMENT AFFIRMED IN PART, REVERSED IN PART AND CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.
 JUDGMENT ENTRY
It is ordered that the judgment be affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. Appellant shall recover of appellees costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Scioto County Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Exceptions.
Harsha, P.J. McFarland, J.: Concur in Judgment Opinion
[1] ADAMH is the agency that plans, funds and monitors alcohol, drug addiction and mental health services in Adams, Lawrence and Scioto Counties.
[2] ADAMH was joined as a party defendant but apparently no claim for relief was asserted against that agency.
[3] In neither the original nor amended complaint does appellant request judgment against ADAMH to reimburse her for the $13,460.40 she paid "under protest."
[4] The Auditor' actually styled her motion as a request for judgment on the pleadings or, in the alternative, for summary judgment. Because the trial court granted the Auditor summary judgment, we confine our analysis to Civ.R. 56.
[5] ADAMH Executive Director John Hogan testified that he understood "comp time" to mean time accumulated "based upon working more hours" than a "40-hour work week." Hogan related that a 1985 memo he issued banned "comp time" for fear of running afoul of federal law. The ADMHA employee handbook later superseded that memo, but made no provision for "comp time."
[6] Appellant actually filed two summary motions. The first ostensibly "against both defendants" (but only addressed her claim against the Auditor), and the second against ADAMH.
[7] Appellant admits in paragraph two on her affidavit in support of summary that she was "not in the classified civil service with ADAMH."
[8] Appellant's claim against the Auditor was for declaratory judgment. The Ohio Declaratory Judgment Act sets out the type of cases that are appropriate for declaratory relief. Waggoner v.Gas Enterprise Co. (Dec. 3, 1997), Washington App. No. 97CA9. Appellant does not specify in her complaint which statute this action is brought under, but it appears that the provision is R.C. 2721.02(A) that allows courts to declare the "rights, status and other legal relations" between parties. Assuming arguendo that appellant's flex time claim has merit, and considering that she would be seeking a refund of her reimbursement to ADAMH for vacation time, it seems arguable that the "right" or "legal relations" at issue in this case is between appellant and ADAMH, not between appellant and the Auditor.
[9] The parties spend considerable time regarding the name to be given the system at issue. Appellant referred to it as "flex" time. Although we agree with the Auditor that it more closely resembles what we traditionally view as "comp" time, the label is largely irrelevant. Rather, the real issue is whether appellant is entitled to record her hours in this manner.
[10] For example, some indication exists that appellant might have used "flextime," rather than normal vacation time, while on vacation. This appears to be a different use of "flextime" than leaving work two hours early because she worked two extra hours the previous day.
[11] To illustrate that point, we need only cite a few of the following colloquies from Hogan's deposition:
"Q. Okay. And the question I have is, how did you implement this flextime scheduling when you were executive director?
A. I don't know that it was ever requested that we do that.
Q. From anyone?
A. From anyone. I have no recollection of that.
 * * *
Q. * * * Who were your other managers . . ? * * *
A. Tony Pollard was the deputy director. Brenda Covert was the chief financial officer. * * *
 * * *
Q. And these directors, as far as you're concerned, could come and go during the regular work day —
A. Right.
Q. — at will, so long as they —
A. I didn't closely monitor anybody's activity.
Q. So no one had — there was not a requirement that people be there for core work hours, where everyone would be there?
A. The only requirement there is that I wanted there is that I wanted to make sure that the front desk was covered for answering telephones and there being somebody in the building during regular business hours.
 * * *
Q. Were there any other flextime opportunities available other than child care benefits?
A. Official ones?
Q. Yes.
A. You know, it really was unnecessary because those people who were allowed to adjust their hours simply adjusted their hours. Again, as long as the work was accomplished, there wasn't a problem with that. * * *
 * * *
Q. From your perspective, when you allowed your managers flextime to come and go and do their job at will, did you have an expectation that they would keep track of any hours they spent working more than 40 hours a week?
A. I didn't, and I didn't really have that expectation of them. I just expected them to do that themselves.
Q. Were they compensated over the 40 hours?
A. No.
Q. Is that part of your justification for not expecting them to keep track of the hours?
A. That, and simply my management style to try to give people that level of responsibility, that kind of authority.
 * * *
Q. * * * I want to reiterate, when you talk about somebody working in excess of 40 hours, let's say one of your managers worked 45 hours, was it — is it your understanding that they could work 35 hours the next week to compensate for the five hours that they worked over?
A. The expectation was they worked sufficient — that they worked a sufficient number of hours to get the work accomplished.
 * * *
Q. Were you aware that Brenda did work from home periodically?
A. I would assume everyone did.
 * * *
Q. My understanding of your earlier testimony is that she should not have scheduled time off using flextime in this manner?
 * * *
A. I can't speak for the word `flextime' in — as it was used by any of the other employees, how they might go about flexing their time. The time sheet in that case would have reflected the eight hours worked, I guess, if that's why you're asking me.
Q. I'm not sure I understand what your answer is. What time sheet would have reflected eight hours worked when? You mean for each day she was off?
A. If this was the way Brenda kept track — how she wanted to keep track of her use of time over and above 40 hours, I — that was up to her to do. We didn't have a policy on that.
Q. And you would call that normally comp time, would you not?
A. Normally you would call it comp time. In our situation, we did not call it comp time. It was just manager's discretion.
 * * *
Q. Would you have a problem if she came in and worked eight hours the next day and three weeks later took four hours off that she had worked that previous night?
A. If it was related back to those four hours worked, yes, because that was not my expectation. I mean, I wouldn't have a problem with it. * * *
Q. Well, let me — I'm either not understanding your answer or something. Because as I just described it to you, that would be comp time to me, if she used those four hours three weeks later. But you said they were not — there is no comp time system?
A. Correct.
Q. So why would that be okay with you if she were to do that?
A. If, in this case for her, that's the way she chose to track how she used her time, how she managed her time, I would — I'm not aware of the system she used and I'm not aware of the system that anyone else used to track that time. * * *".
[12] We emphasize that our comments should not be construed as criticism of Hogan's management style. First, that issue is not pertinent to the matters before us in this case. Second, we note that evidence indicated that Hogan's employees, including appellant, performed their work satisfactorily.
[13] With regard to Hagan's testimony, the trial court also determined that no evidence established that ADAHM established a policy to grant "compensatory time" (or "Flextime") and, in any event, appellant could not reasonably rely on Hogan's assurances she could take such time. We disagree. First, as mentioned previously, Section 602 of the employee handbook allows "flextime scheduling" in "some cases" as established by the employee's supervisor. That handbook purports to contain the "personnel policies" of "ADAMH BOARD of Adams, Lawrence, Scioto Counties." Thus, ADAMH apparently did have a policy to permit "flextime." We also discern nothing unreasonable, as an abstract proposition, in an employee relying on a supervisor's assurances that she could take such time.
[14] We emphasize that our ruling should not be construed as a comment that this case cannot be resolved on summary judgment. Rather, the evidentiary materials at this juncture are too unclear and confusing to resolve it in that manner at this time.